Good morning, your honors. My name is Karen Booker. I represent Kyle Grasso, and with the court permission, I have to reserve five minutes for rebuttal. Mr. Grasso was the realtor used by the scheme on the legitimate leg of the real estate transactions on the case we heard earlier this morning. Mr. Grasso argues that the evidence is insufficient to support all of his convictions, and unless the court directs me otherwise, I'd like to focus the argument on the money laundering counts and the Clearidge loan fraud counts. What was the second one? I'm sorry? What was the second one? I didn't hear the second one. The second one is the Clearidge loan fraud counts. That's the loans for his own home. On the money laundering charges, the government's case rested on three checks payable to defendants, real estate firm, for the yokem and benefit transactions. And the government's theory was that these fees were payment to gain access to the title company, California Title, to facilitate these deals. And Mr. Grasso argues that there's insufficient evidence to support these convictions because the offense of money laundering must be separate and distinct from the underlying offense. And the payment of these fees are not money laundering because these fees were part and parcel of the underlying fraud scheme. The fees were used for the fraud to gain access to the title company, so without access to the title company, they couldn't complete the scheme. It was sort of a demand after the fact, right? As the government portrays it, as the evidence was raised by the government, that Mr. Grasso demanded this money after the fact. He was angry at them, and he said, if you want continued access, then you have to give me this kickback for these other two deals. That's correct, Your Honor, and that's how it started. So at that point, to complete the deals from that point forward, they had to use California Title. But was the money laundering count just that one incident, or was it later ones as well? It was three instances, and I believe that they were later. They were on the yokem and benedict transactions, and I believe that they were later. The site for the checks. In other words, it had become a pattern, essentially, that they were getting these kickbacks for transactions that they weren't otherwise involved in. From the record, I only believe that there were these three. So was the yokem, as that was pronounced? That's the way I pronounce it, Your Honor. And the canyon, and what was the third one? One of them was two, and I can't recall right now. One of them, there were three, either two on yokem or two on benedict. But the exact record sites for these checks is Volume 2, My ER, 396-410, and that details all the checks referenced to the transaction. And I'm sorry I couldn't answer that more specifically. I guess the question is, the way the statute works, do you take each transaction separately, or do you look at the scheme as a whole? Because I gather the argument is that even though the payments were made after the fact with regard to transaction X, they were made prior to transaction Y and were essential for transaction Y, or in some vaguer sense. Is that basically what you're saying? They weren't essential for the one that had already happened. Correct. They were part of a larger scheme in which, by giving these payments, they were maintaining access to the title company for future purposes. Correct. So the question is, does the statute care about that distinction? Does the statute stop? I mean, your argument seems to be that we look at each transaction discreetly, and because with regard to the particular transaction, the check payment didn't have anything to do with facilitating that transaction. The transaction had just occurred, and it wasn't money laundering. That's the government's position. Your position is the opposite, i.e., it might not have had anything to do with facilitating the last transaction, but it had to do with facilitating the next transaction. From that point forward, I believe, to the whole scheme, from that point forward. But they weren't charging it as a scheme, right? They were charging it as three distinct transactions. So what do we do then? I'm sorry, I don't understand. Can they make that charging choice such that they're looking at distinct transactions that are not looking at the impact on the next transaction, they're looking at the impact on the last transaction? I understand this to be from a certain point forward for each further transaction, that they paid the fees in order for the scheme. I understand that. I'm asking you how that dovetails with the statute and the elements of the crime, the money laundering crime. How does your theory fit in to the elements of the money laundering crime? Well, the money laundering cannot be the same as an illegal activity, which produces the proceeds. It has to be distinct. It has to be separate. The Ilkum and the Benedict Canyon activity, I guess, if I understand Judge Berzon's question, those were transactions that Mr. Grasso had nothing to do with. He wasn't involved other than to demand this payment. And so in the Rule 29 context, is that sufficient to show a separate transaction and this receiving funds for the proceeds as being separate? In other words, what is wrong with looking at the last transaction rather than the next one for purposes of the money laundering statute? I just need you to explain that to me because that's your fundamental position. Because that's when it first started. There was no money laundering until that phone call happened. If I'm understanding you correctly, this offense did not begin. What does the statute say? Let's start there. The statute says, well, that the fund, the, well, I'll just read. Anyone who knows that the money involved in a financial transaction comes from a specified unlawful activity, and here this is the bank fraud and the loan fraud, the money coming from the underlying activity, with the intent to promote and carry on of the specified unlawful activity, and the transaction is designed to conceal the source of the specified unlawful activity. And it has to be separate and distinct from the bank fraud. And I guess what my argument is, it's not separate and distinct from the bank fraud. And let me clarify what you just said because we have to start with identifying the predicate crime and then to determine whether the transactions charged as money laundering constitute a core part of that predicate crime. Now, you mentioned both loan fraud and bank fraud, but do you agree that the predicate crime in this particular case, as it relates to the Yoakam and Benedict Canyon properties, only have to do with the bank fraud charge? So the predicate crime is the bank fraud because he's not charged with loan fraud in connection with the two properties that relate to the money laundering transactions. Did I get that right? Yes, and in order for the bank fraud to be complete, in order to complete it, they had to use the title company to do the two title. All right, but if we agree that the bank fraud is actually the predicate crime, can't we look at the fact that the bank fraud scheme had been continuing for about two years before these payments were even made? In our analysis as to whether the transactions even form a core part of the bank fraud scheme? You know, I haven't thought of that, Your Honor. I think the answer would be no, because that's not part of the money laundering defense. I don't think that's part of the analysis. Because the point of money laundering... Let me try again to explain what my problem is. The bank fraud with regard to the particular transaction, let's say the Yoakum property, had occurred. He was then paid some money after the bank fraud had occurred. Is that correct? Yes, but in order for the bank fraud to occur, they had to use the title company. Yes. Okay, but that was over before he was paid. And you're saying, are you essentially saying that he was paid for, even though after the fact, for the use of the title company in that transaction? Is that what you're saying? He was, he happened to be paid after the fact. I understand that. But in order for them to use the title company, he had to be paid. That's why it's part of the underlying defense. For that transaction, I thought the evidence showed that he found out about it after the fact and was angry and said, you have to pay me because otherwise I'll bar access in the future. I don't view the money laundering accounts as part of the prior transaction. I don't think that's part of analysis. I think that was a new crime that came up at a certain point in time. See, the point of money laundering is to hide illegally obtained money. And here, the payments weren't used to hide the money. But it doesn't just have to be concealed, right? There's two prongs. There's the promotion prong and the concealment prong. I'm sorry. Well, one is with the intent to promote the carrying on of a specified unlawful activity. And then the second is or to conceal the nature of the location source, ownership or control of the proceeds of the unlawful activity. So it's either prong, right? Promote or conceal. Yes, to continue on with the crime, to promote the crime. And in order for them to promote, to continue the offense of fake fraud, they had to use the title company. And in order to use the title company, they had to pay Mr. Grasso. And that's part of the offense. And that's where I'm basing my argument on.  It's not distinct and separate. See, the government is saying that the payment to Mr. Grasso for the use of the Celt title was necessary for Abrams' scheme to obtain the loans. So it's part of the scheme. It's not separate and distinct. Well, the prong about promoting the carrying on of a specified unlawful activity has to have – obviously does have some connection to the specified unlawful activity. Specified unlawful activity, right? Yes. So it can't be separate in that sense because that's an element of the crime. Can you ask the question again, please? Sorry. Your theory is that this money was being given to him in order essentially to promote specified unlawful activity, i.e., the next transaction. Is that your theory? No. For that transaction. In order for that particular transaction to take place, he would have to get paid. Even though he was – Hadn't Yoakam and Benedict Canyon already taken place? And this payment was after the fact? Am I misunderstanding the evidence on this? He was paid after the fact, but he knew he was going to get paid. It was part of the deal. The checks to him were cut after the deals. But the point was in order for the bank fraud to happen, he – Okay. Just help me understand this because based on my reading of the record and, again, we're looking at what a reasonable jury could believe, that he didn't even find out about the transaction until after it happened and then he demanded some payment after the fact. He had found out there were some transactions that were occurring with CalTitle where they weren't using them as agents. And then he said for further transactions, if you want to use CalTitle, we need to get a referral fee or a fee. That's when it started. So he didn't get a referral fee. You're saying that the evidence doesn't show that he got a referral fee related to Yoakam and Benedict Canyon. It was only as to subsequent transactions. In the beginning, they didn't receive any fees at all for the use of CalTitle. Then it became a point in time when they separated and the scheme was using CalTitle without Mr. Grasso and his codependent. They found out about it. So they called – Mr. Grasso called the scheme. Was that at the time of the Yoakam and Benedict transactions? I believe that was prior, Your Honor. From my recollection of the record, that was prior. And then when the Yoakam and Benedict – So the Yoakam and Benedict transactions were not the transactions that they found out about and said we want to get paid now for this past transaction that we have nothing to do with. I don't believe so, Your Honor. From my recollection – But you believe so or you don't. It's my recollection from the record. It's not the way that – It's rather important, and you're here to argue, and someone's got to know the record, and it's you. Is it true or isn't it true? I would have to consult the record, Your Honor. I apologize. It's my recollection that the phone call was made and then for future transactions such as Yoakam. You believe that this was one of the future transactions and not the – Yes, Your Honor. In which you would say there was already an understanding because of this earlier interaction that – Phone call, yes. That there would be an after-the-fact payment for that – for the later transaction and was sort of a quid pro quo for that – having that transaction. Is that your basic argument? In order for – yes, in order for the scheme to continue. Well, in order – let's take the particular transaction, the Yoakam transaction. At the time that that transaction was going on, it's your understanding that there was already an understanding that when it was finished, Mr. Grassa was going to get a payment. And had there not been that understanding, he wouldn't have allowed them access to the company, the title company for the transaction, for the Yoakam transaction. Yes. That was the last one, not the next one. In order for that transaction to be complete, yes. That's your basic argument. It's taking a very long time for you to make it. Is that your argument? Yes. So the evidence – just let me reiterate to make sure I understand. So the evidence shows that he had an understanding with, I guess it was Abrams, that before they could use CalTitle for Yoakam, he would get paid at the end of the transaction. I don't think the recollection – I mean, I don't believe the telephone conversation might have mentioned Yoakam or any specific property. It was for future – But your next transaction, whether he's involved or not, you can't access CalTitle without paying me at the end. And so then the next transaction happened to be Yoakam. They used CalTitle, and they paid him at the end as they had previously set up. Is that what you're saying? They did, but in order for that transaction to go through, in order to complete the bank fraud advance, he had to be paid. It was part and parcel of the whole scheme. But is my timing of those events – I believe you are. Is that what you're saying? That's my recollection, yes. Okay. Thank you. All right. Do you want to briefly make your other argument? The other argument, just real briefly, is on the Clear Ridge loan transactions where Mr. Grasso purchased his own home. And it's pretty – it's well – I believe it's pretty well briefed in our briefing. But basically, for the loan fraud counts, there was insufficient evidence to prove that Mr. Grasso knew that he was influencing the bank. There was no evidence that this broker went shopping at banks. And all the loan documents, if you look at them, they all refer to the mortgage company, to Greenpoint Mortgage, the promissory note, the deed of trust, the closing instruction, everything in the record. And there was no evidence that Grasso, as a rather sophisticated person in this market, knew of the connection between the bank, the bank and the mortgage company? No, not on this record. Just because he was part of the industry, without more, doesn't prove that he knew that AmeriCorps went to a bank. You need something more in a record. And a good case is the U.S. v. Pellucci case. In that case, the defendant was very similar. He was a mortgage broker. And he testified – he actually went on the stand – and he understood that he knew about the practices of brokers, that they would go shopping around to banks. And the court in that case found that the jury could make a finding that he was influence in a bank just based on his testimony. And whereas Mr. Grasso did not testify, there's nothing in the record that anyone can point to or the jury can point to to show that he knew. But didn't Abrams say that he, as part of his scheme, he was, as part of AmeriCorps, he was seeking banks, Lehman Brothers and the Greenpoint Bank, and that there was evidence that Grasso understood the nature of the scheme, or Abrams so testified? No, I believe he testified in that manner. But as far as this particular loan, I believe it's just focused on this particular loan, that there's no evidence that he knew that he was influence in a bank with his statements on his application. If you want to reserve any time you have. Yes, Your Honor. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Jeremy Matz, again, for the United States. And as I stated, I was one of the trial prosecutors in the case with regard to this trial. I'll start first with the money laundering counts, because that's where the court started and where counsel started. I think it is entirely correct to begin with the statutory language, obviously, and to ascertain exactly what the elements are. And, of course, what the elements are are, first of all, that there was a financial transaction, second, that that financial transaction involved the proceeds of specified unlawful activity, and third, that the financial transaction was conducted with either the intent to promote ongoing or future specified unlawful activity, on the one hand, or, alternatively, with the knowledge that the transaction was designed to conceal or disguise the nature or the location or the source of the proceeds that were used in the financial transaction. And as Your Honor pointed out, either one of those final two prongs is sufficient. In this particular case, they were charged in the conjunctive, but, of course, proof in the disjunctive would be acceptable. And there was proof of both prongs, as a matter of fact. Focusing with a little more detail on that, I think that the Court's questions are entirely correct as to whether the proper analysis is as a scheme, as a whole, or, on the other hand, as to particular transactions. And I think the answer to your question... I gather you're taking it as particular transactions. Correct, Your Honor. All right. So taking it that way, why isn't, or put another way, why don't they collapse into each other in the following sense? That once you have a scheme going in which it's understood that to have access to the title company, they have to make payments to Mr. Grasso based on each transaction. The fact that the payment is made, and they would not have, in essence, unless you give me some money based on X transaction, you're not going to get access to the title company for that transaction. The fact that it's paid after the fact doesn't matter. I mean, people are often paid after the fact. And the fact that there were also future transactions doesn't seem to me to eliminate the likelihood that there was an understanding for each transaction, that you're going to pay me after the fact based on that transaction, or I'm not going to let you in for that transaction. Okay. I think I understand the tenor of the Court's questions, and I think the overarching answer to that question is the following. If the different rule were the law, namely that you look at the entire scheme as a whole, rather than particular transactions, then I think by definition there could never be any money laundering committed. I'm not doing that. My question is predicated on the particular transaction. Yes. But simply on an implicit understanding based on the scheme as a whole, that for that transaction, in other words, that going into the Joachim transaction, it was understood that it was going to be paid after the fact. And that is why he allowed the access for that transaction to the escrow company. Could you start by answering whether that's correct factually, because I was confused about the sequence of events. Before the Abrams group started on the Joachim transaction, did they already have a deal in place with Grasso to pay him off afterwards? I think that they did, Your Honor. It was a little unclear at the trial testimony exactly when this arrangement was worked out between Abrams-Fitzgerald on the one hand and Grasso-Babijan on the other hand. But the testimony from Mr. Matykowski, who worked for Mark Abrams and Elliot Fitzgerald, was that I think he got that phone call from Grasso towards the end of 2001, and I believe that's what the record testimony was. And the Joachim transaction, the Benchik transactions were when? In 2002, around midpoint, I believe. So the time when he blew up and said, you know, you can't have access to the entire company without paying me was before any of this? I think it was before Joachim and Benedict. That's correct. So why isn't the, what was really going on here was simply an understanding that for each transaction, unless you pay me after the fact, which was perhaps a concealment device, I'm not letting you in for that transaction? That may have been part of the understanding, Your Honor, but what Joachim and Benedict proved was that even if that was the deal that was supposed to have been worked out, Mark Abrams and Elliot Fitzgerald, for their part, were willing to violate that deal and in fact did so on Joachim and Benedict because, as the evidence clearly showed, they went ahead and did that deal and even got access to the title company and consummated both transactions without Mr. Grasso or Mr. Babijan having any involvement in those deals at all. And the testimony was entirely unanimous on that point. The sellers' agents representing the sellers of both homes, Joachim and Benedict, testified that Grasso had nothing to do with these deals and that they didn't even know that Grasso was in any way involved in these deals. But was the deal that Grasso would be involved or just the deal was that he would get some payment for it, for access to Cal Title? The deal, I think, was that he would get some payment for it, but I believe that Judge Brisson's question was, what if the deal was that unless you pay me, I will not, unless you pay me, Kyle Grasso, I will not allow you access to the title company on these particular deals? The other implicit understanding, I gather, was that he could have blocked it. He didn't have to be involved, but he could have prevented that access if he wanted to. Okay, but the whole point of the evidence on those two transactions is that he did not and that they were able to – They did not what? That Grasso did not block the consummation of those transactions. Because he knew he was going to get paid, no? Perhaps, Your Honor, yes. But I think that – Was the factual evidence that Abrams went behind Grasso's back and accessed Cal Title directly, and then when Joachim and Benedict Canyon, when those transactions were completed, Grasso found out about it and confronted them and then the referral fees got paid in connection with those two transactions? Was that factually how it happened? That is factually how it happened, although not clearly as to Joachim and Benedict. In other words, and I think it was on properties prior to Joachim and Benedict. That's exactly how this arrangement – The first time, but – Correct. Right, but if this was all set up by the time we got to Joachim and Benedict, then it was just part of the whole project. I mean, the question is, is this just a cost of doing business, or in some way is it separate from the scheme, the bank fraud scheme? I think it's clearly separate, Your Honor, because, again, the place to start and even perhaps the place to finish is what are the elements of the crime and what does the crime require? The crime requires that proceeds of an underlying specified unlawful activity, in this case the bank fraud and the loan fraud, have been used in the financial transaction. That clearly was the case here. I think that's undisputed. The money to pay Grasso and Babijan on these deals was clearly proceeds of the bank fraud and the loan fraud, I would add. And, second, that the intent of making those payments was to promote additional specified unlawful activity. There was clear testimony from Abrams and from Matikowsky establishing exactly that point. Namely, we were paying this money to Grasso on these homes and it just in general proceeds of this arrangement. Well, what if it were – In order to – The point of it – this is sort of a sticky statutory question, but if the point of it was, I mean, both as because of an implicit understanding that he would have blocked access for the Yoakum transaction and also because he would otherwise block access to the next transaction. That seems likely to be the truth. So, what if that were the case? Does that meet the statutory scheme or not? Yes, I think it would, Your Honor. So, in other words, the fact that it was an integral part of the past transaction doesn't matter if it was also a promotion for the next transaction? I think that's correct because I know – Isn't that going to happen most of the time? I mean, if you have any kind of ongoing relationship, ordinarily if people don't get paid for the last transaction, they're not going to enter into the next one? Well, that may be the case and that was the point I was trying to make just a few minutes ago. I think that's exactly why the convictions on these counts need to be affirmed and doing so would be in compliance with the statute. But in that case, why isn't it true, though, that any time you have some ongoing fraud scheme and someone gets paid for his part in the last transaction as part of that scheme, you could say, well, it promotes the future transaction because if he didn't get paid for the last one, he's not going to engage in the next one. And therefore, essentially you've eliminated the requirement that there be a distinction between the money laundering and the crime. No, I don't think that doing so would eliminate that because, of course, there would have to be evidence, clear evidence, and there was here that the second of those two factual matters was in fact the case, namely that, one, there was a contention on the part of everybody to do additional fraud and, two, that these payments were necessary in order to do that additional fraud. No, as long as it's not a one-shot deal, the distinction goes away. I think that's correct, or more precisely, perhaps. Is there a case law saying that? Well, there's no case law that I know of that says the opposite. Namely, there's no case law that I know of that says that no payments made during the course of a long ongoing fraud scheme can ever constitute money laundering as long as the fraud scheme is still ongoing because that's sort of the result that we get to if we adopt the additional rule, I think. In other words, as Her Honor pointed out earlier, this was a long ongoing prolonged fraud scheme, two and a half, three years, involving, at the end of the day, about 70 or 80 or 90 fraudulent transactions. If the court were to reverse these convictions for the reason proffered by Mr. Brasso, I think it would essentially be tantamount to a holding that any payments made, even when those payments are clearly designed to promote future fraud and to conceal the nature of the fraudulent transactions in this case, any such payments made during the ongoing fraud scheme can't constitute money laundering just because the fraud isn't over yet. And that clearly can't be the rule. If that were the rule, there would be virtually no rule. It wouldn't be because the crime isn't over yet. It's because it was a quid pro quo for a particular transaction. And even if that fact that you're giving somebody a quid pro quo for a particular transaction is going to make them more likely to conduct the next transaction, that doesn't fulfill the requirement of promoting the next transaction. Well, but it might, Your Honor. And if it does, in other words, even if there is this dual purpose, I don't think that would in any way negate the adequacy of the evidence as to the money laundering transactions. We have the problem at hand now, so thank you for that. If they were ‑‑ if the government had charged Grasso with the Yokum or Benedict Canyon bank fraud, which I suspect it could have under the Pinkerton theory, correct? Potentially, Your Honor. I'd have to analyze that. But, of course, the unanimous evidence was that he played no role in either of those transactions and had nothing to do with them and may not have even known that they were going on at the time. If he had been charged with them, say, would that eliminate the money laundering count because there would be merger under Santos? Would you still be able to bring a money laundering count in that case? I think that we could still bring the money laundering counts, and I think that the elements might still be met for the very same reasons I've been discussing so far. It might be a closer question. I can completely see the court's question. Has this problem ‑‑ does this problem pertain to the particular issue in Santos having to do with profits versus proceeds? No. It doesn't. So, therefore, the amendments, the more recent amendments, post-Santos amendments, are not relevant to this? They're not relevant, I think, in the sense that they were not the law at the time. No, but even if they were the law at the time, would it make a difference? I think that's right in the following sense. I don't understand the defense's claim here to be a Santos claim at all. I didn't either. Right. They have a very different argument, namely simply that these were ‑‑ these payments were not separate and distinct from the underlying fraud. That's the crux, in fact, the only crux of the defense's arguments, and I think for all the reasons I've already established, that's just not the case. There was abundant evidence that these payments were, in fact, completely separate and distinct, took place after, and were completely distinct from the underlying fraud, which on those two homes was a fraud that Mr. Grasso had no involvement with whatsoever. That's an important point to keep in mind. Do you want to discuss the other issue that she discussed? Yes, Your Honor. Thank you. Briefly with regard to the counts pertaining to Mr. Grasso's own home located on Clare Ridge Drive. In the first place, it's important for the court to keep in mind the only counts of conviction that Mr. Grasso is challenging for that reason, namely the reason having to do with federal insurance of the institution, are the loan fraud counts, the 1014 counts, substantive counts, of which he was convicted pertaining to that house, the Clare Ridge house. He is not challenging the conspiracy count based on that ground, the federal insurance ground, even though the conspiracy count encompassed the Clare Ridge home. He's also not challenging the bank fraud count of which he was convicted for the federal insurance reason, even though that count also encompassed the Clare Ridge home. So the only counts at issue here on this point are the 1014 loan fraud counts. With regard to those counts, it's very important to keep in mind some very critical facts that were proven and adduced at the trial as to that issue. And many of these facts are the same kinds of proof that was missing, not present in the case of U.S. v. Bennett, a case of this court that reversed Section 1344, pronged two counts having to do with federal insurance. I'm referring to the following. There was clear proof and also, of course, the allegation and the indictment that it was the bank, namely Greenpoint Bank, that had the federal insurance that was defrauded here. It was the bank, namely Greenpoint Bank with the federal insurance, that actually funded these loans, the money that went into the escrow company. My understanding of her argument now, not in the briefs, is not to dispute that, but to argue he didn't know it. That he didn't know it, I believe that's correct, but that's not required, and that's a key point to focus on. It's not required in the following sense. That's the Belucci case of this court, which I think is the controlling case here. As that court points out, as that case points out, I should say the Belucci case. Let me make sure I describe this properly here. It is not a requirement that the government prove that the defendant knew which particular bank his false statements were going to be sent to. It's not a requirement that the government prove that the defendant knew that whatever particular bank ended up being the recipient of his false statements in fact had federal insurance. That's not any part of the requirement under 1014 as the Belucci case. That it was a bank. That it was a bank. A federal insured bank. Correct. Because as the Belucci case points out, it's not necessary to prove that the defendant knew which particular institution was involved. If that's not required, then clearly it's also not required to be proven that the defendant knew that the particular institution involved actually had federal insurance as a sort of a happenstance. In other words, the thrust of the Belucci case, Your Honors, is that the government must prove that the defendant knew that it was some kind of bank, financial institution, not in the federally insured sense, but some kind of a bank or financial institution as opposed to, say, what we see in some of the other cases, a leasing company, a transportation equipment company. And that's because the FDIC is a jurisdictional one. Correct. That's correct, Your Honor. And the clear thrust of various cases that are cited in our brief is that by passing a statute, 1014, Congress was intending to try to protect federally insured banks from all sorts of fraud, even in cases where the federally insured bank is the one that ends up losing the money but is not necessarily the one with whom the defendant interacts. And that's why that requirement is not present, the defendant's direct and personal interaction with the federally insured entity. All right. So what is the evidence here that he knew it was a bank? The evidence here that he knew it was a bank, Your Honor, includes the following. First, that he was a preeminent real estate agent in the United States, in fact, one of the very top of the top. And I think it's a common sense understanding, in fact, it was proven in this case, that real estate agents certainly at that level know that the types of institutions that make loans to people to buy homes are banks. What was the evidence in the record as to that point? That he was a top agent? Not that he was a top agent, but that top agents know about banks. Well, as I said again, Your Honor, it's, I think, in large degree a common sense understanding on the part of everybody. In Bellucci, there was some specific evidence, right, on that point, the testimony? There was evidence, I think, that he was a mortgage broker. There was, of course, clear evidence here that Mr. Grasso was a real estate agent. In Bellucci, I think the defendant did take the stand, as counsel described in her remarks, whereas in this case, Mr. Grasso did not. It's also important to remember, of course, that in this case, the evidence as presented showed that at the time Mr. Grasso was doing the fraud on his own home in order to buy that home, the Claridge home, which was the summer of 2000, he was also up to his neck doing fraud on other homes with the very same people, Mark Abrams, Nicole LaViolette, the loan processor, Timothy Holland, the escrow officer, the very same people who helped him get the loan on Claridge. To back up to the Bellucci thing, the analogy, there he was dealing with a mortgage broker, but here I think he, did he think, did he not think that he was dealing with a particular company, the Green Bank Mortgage Company? Did Mr. Grasso think that he was dealing with the subsidiary? Right. Well, just rather than dealing with a variety of financial institutions, did he think he was dealing with a particular financial institution? Yeah. The Bank Mortgage Company. I think he thought he was dealing with a financial institution called Greenpoint. Greenpoint. Correct. Okay, a particular one. Yes. Right. So the Bellucci analog, which says anybody in this industry would know that if you're shopping a loan around, one of the people you're going to shop it around to is a bank, doesn't really work, because what he would have to know here would be something like anything that calls itself a mortgage company is necessarily affiliated with a bank. Not necessarily that anything that calls itself a mortgage company is affiliated with a bank that has FDIC insurance. That's not what he's required to know. I say FDIC insurance. Right. Just that anything that calls itself a mortgage company is a bank financial institution in the colloquial sense that we all understand it. That's my understanding. So is your position that the mortgage company itself is a bank or that its parents are bank? Well, the mortgage company is not a financial institution in the sense as that term is defined in Section 20. What is the link? What was he supposed to have inferentially known when he was dealing with, unlike the person, as I understand it, the Bellucci, he knew a particular institution he was dealing with, only one. Is that correct? Mr. Grasso? Yes. I believe so, certainly, during the escrow process. So the Greenpoint Mortgage Company. Correct. Right. From whence do you get an inference that the Greenpoint Mortgage Company must have been affiliated with a bank? Well, among other reasons, because it's a lender that Mr. Grasso is applying to to get a loan to buy a house. Are there not mortgage companies that provide mortgages and aren't banks? They may not be banks, again, as defined by Section 20, but that's the FDIC requirement, and that's not what Mr. Grasso needs to have known. He only needs to have known that it was a bank financial institution in the colloquial sense. That's what the Bellucci case holds. I'm still confused. So are you saying the mortgage company was the bank? No. I'm not saying that the mortgage company was the bank federally insured. You're saying that anybody who gives a loan is a bank. No. Anybody who gives a loan may be a bank sufficient to constitute Bellucci knowledge, is what I'm saying. And why is Greenpoint Mortgage Company a bank in those terms? Because it was a, again, because it was a lender making a loan to buy a home. When you take away the federal insurance requirement, as far as what the dependent is required to know, what's left is that he understands that it is a bank financial institution in the colloquial sense that makes loans to buy homes. And before going into the escrow process, he had filled out an application for AmeriCorps, which is a broker. At the point when he filled out this broker form that was signed by Abrams and signed by him, did he know that the only entity that was going to provide him with a loan was Greenpoint? Is that what the evidence showed? I'm not sure at what point in the escrow process he came to understand that his loan ultimately would come from Greenpoint. I don't know that. Typically, in the escrow process, if you're working with a mortgage broker, as Graca was here with regard to Abrams, you would fill out your application, and the broker evaluates various lenders and essentially chooses one that may be the best for the client. And at some point in this case … If that were the perspective we were looking at, then we would have a direct analogy to Bellucci, and everything would be fine. So it's fairly critical to know what perspective are we looking at here, i.e., was there an understanding that, what Judge Acuda asked, was that the situation, or was the situation that everybody knew that it was going to be Greenpoint Mortgage Company from the outset? I guess, what was presented to the jury? What evidence was there? Because we're supposed to take all the inferences in favor of the prosecution here. Correct. And overall, and I'll wrap up with this point, the evidence that was presented to the jury was that at the time Mr. Graco worked with Mr. Abrams to get this fraudulent loan on his own house, he was also, in total, working with Mr. Abrams to get other, even bigger fraudulent loans on other homes, all at the very same time, from not just Greenpoint Bank, but in those other cases, from Lehman Brothers Bank, for example, on the Alta Drive property, from whoever the lender would have been on the Summit Ridge Drive properties, had those properties gone through to completion. In other words, this was a time period when Mr. Graco, as I said before, was up to his neck working with Abrams, and Holland, and LaViolette, and Madakowsky to get fraudulent loans. Maybe this was the wrong transaction then, but I don't particularly see why that helps. It helps, Your Honor, and it's important to keep in mind, because it shows that Mr. Graco knows in his own mind that what Abrams, and Fitzgerald, and these people are in the business of doing, including for him on his house, is submitting loan applications to banks. They could have been defrauding a mortgage company, not a bank. Well, is it fair to say that at the time that the application packet was submitted to AmeriCorps, there was no evidence presented to the jury that they knew, either in advance of that application packet being submitted to AmeriCorps, or during that process, that only Greenpoint was going to be reached out to fund the loan in this particular case? Or to ask it another way, is there any evidence that would tell us exactly when Mr. Graco became aware that Greenpoint mortgage was going to be utilized? The evidence that would answer that question, Your Honor, would be the loan documents with the name Greenpoint on them, which show that no later than the date of those loan documents, and they are in the record, Mr. Graco knew that it was Greenpoint and not some other lender that was going to be doing his loan. By definition, we can at least say that, that by at least that time period, if not earlier, Mr. Graco knew that it would be Greenpoint. Okay, thank you very much. You're very helpful. Thank you. You're over your time. We'll give you a couple minutes to wrap it up. Thank you. I say two minutes because he went over. Your Honor, I just have one comment. Regarding the documents of the carriage loan documents, every one of those documents distinctly says Greenpoint Mortgage, no reference to Greenpoint Bank. Well, but he originally apparently filled out an application for AmeriCorps, which was a mortgage company. Is that right? That's correct. And at the time he filled that out, was Greenpoint Mortgage Company unseen? No. So at the time he filled that out, why wasn't he just in the same position as the person in Belushi? Also, the person in Belushi, when he signed out his loan application, his signature was also of a 1014 warning that his application could be submitted to a bank and any false statements could be constituted loan fraud. That was another distinction. He was put on notice, the defendant in Belushi was put on notice of federal loan fraud that his loan application could possibly go to a bank. In this case, there just simply was no evidence. Well, for that purpose, it seems to me Mr. Grasso's position in the industry certainly has to be relevant. If he filled out a loan application with a mortgage broker and he apparently does this every day on behalf of his clients, he certainly knew it could go to a bank. But there's no, you need a little bit more. That's kind of like speculation. You would need a little more just because he's familiar with the practice in general because that's what he does. I think that the government would have to prove beyond a reasonable doubt that he knew he was influencing the bank. And just because he works in this industry is not enough without more. In Belushi, there was more. But would it matter if he filled out the AmeriCorps application but it never went to any other bank but Greenpoint, anybody else but Greenpoint Mortgage, would it make any difference that it could have gone somewhere else in terms of the statutory requirements? I don't think it could because it didn't. I mean, I don't know what happened. I don't know how to answer that because it just didn't happen. The only thing that we know from this record that he applied for a loan and then the only loan document show was from Greenpoint Mortgage. Okay. Thank you both very much for a useful argument and complicated things. The case of United States v. Grasso is submitted.
judges: Berzon, Ikuta, Nguyen